**SUPERIOR COURT-**
OF THE
**STATE OF DELAWARE**

**VIVIAN L. MEDINILLA**
Judge

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DE 19801-3733
TELEPHONE (302) 255-0626

December 14, 2023

William H. Leonard, Esq.
John S. Taylor, Esq.
Issac Rank, Esq.
Department of Justice
820 N. French Street, 7th Floor
Wilmington, DE 19801

Benjamin S. Gifford, IV, Esq.
Law Office of Benjamin S. Gifford, IV
14 Ashley Place
Wilmington, DE 19804

John B. Barber, Esq.
Law Office of John Barber
24B Trolley Square
Wilmington, DE 19806

RE: ***State v. Diamonte Taylor* - Case Id No. 1605012921A**

Dear Counsel:

On December 5, 2023, the Court granted Taylor's motion for mistrial and indicated that a written decision would follow. The analysis is provided herein.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In 2018, a jury convicted Taylor of Murder in the First Degree, Gang Participation, Assault First Degree, two counts of Reckless Endangering First Degree, two counts of Aggravated Menacing, and numerous related firearm offenses.[1] Taylor was sentenced to, *inter alia*, a mandatory life sentence for the first-degree murder count.[2] Taylor appealed,[3] and in September 2021, the Delaware Supreme reversed this Court's judgment and remanded the matter for a new trial.[4]

---

[1]    D.I. 78.

[2]    D.I. 105.

[3]    D.I. 106.

[4]    *Taylor v. State*, 260 A.3d 602, 619 (Del. 2021).

Taylor's case stems from a purported gang feud in the City of Wilmington between a street gang known as Shoot to Kill ("STK") and its alleged rival known as Only My Brothers ("OMB"). The ongoing gang rivalry allegedly resulted in various violent events, including the 2016 murder of Brandon Wingo. That murder is at the centerpiece of this trial.

As part of its case-in-chief in Taylor's first trial, the State presented evidence from its disclosed "gang expert" William Moran who testified about the STK and OMB rivalry to establish, in part, the State's theory that Taylor was a member of STK who participated in illegal gang activity and was motivated to commit the murder of Wingo for retaliatory reasons.[5]

Taylor's retrial began on December 4, 2023. The State called Daniel Masi, as its "gang expert." Masi was substituted for William Moran.[6] Like Moran, to support the State's theory that the Wingo murder was gang related, Masi explained his understanding of the meanings of hand signs depicted in photographs of alleged gang members and offered opinion regarding social media messages/postings in the days before and after Wingo's murder. These included references generally to STK and some specifically to Taylor.

During direct examination, the prosecution established Masi's credentials as an expert, including that he had been employed at the Delaware Department of Correction (DOC) until 2018 when he assumed his current role with the Delaware Department of Justice (DOJ). He told the jury that, while at DOC, he served as an investigator for the Security Threat Group Unit, handling gang investigations and monitoring gang communications, both in the prison and on the streets for safety purposes. This included approximately 30-40 hours per week obtaining "intel" from gang members. And that the bases of his expert opinions were formed through various sources, including these extensive interviews conducted with known gang members.

---

[5]   To establish the State's theory that the murder of Brandon Wingo was a retaliatory response to the ongoing STK/OMB feud, Moran utilized social media evidence to explain his understanding of the meanings of hand signs depicted in photographs of alleged gang members and offered opinion regarding various username postings/messages in the days leading up to and following the murder.

[6]   Interestingly, Moran was called as a witness in the second trial but only to authenticate certain social media evidence introduced in the first trial, now sought to be admitted through Masi.

Defense Counsel requested a sidebar to obtain reassurances from the State that Masi's testimony would be limited to the expert testimony that Moran had provided in the first trial. The State informed Defense Counsel that the testimony would not be expanded and that Masi did not remember interacting with Taylor. The State resumed its direct examination of Masi, which continued for the remainder of the day.

On Day Two of trial, on cross-examination, Masi told the jury that he had interviewed Taylor and identified him as a member of the STK gang:

Q. In describing your training and experience you mentioned speaking to gang members?

A. Yes, sir.
****

Q. Let's be very specific then, did any gang members purportedly associated with the purported gang STK speak with you about hashtags or what different slang meant?

A. Yes.

Q. Who?

A. One for instance was co-defendant [].
****

Q. What other members of STK did you purportedly speak to, purported members did you speak to?

A. *Multiple members of STK including Diamonte Taylor*….

Asked to clarify, defense counsel continued:

Q. Let me be very clear when I asked what purported members of STK you talked to *I don't mean in passing, I mean interviewing them* about the topics that you are testifying to today?

A. Yeah, great question. *At that time in 2015, 2016 I was interviewing STK members, as I said yesterday, 30 hours of the week almost*. . . .

3

So STK and OMB, interviewing multiple members between both gangs was a daily basis at that time. . . .[7]

Defense Counsel requested a sidebar and moved for a mistrial. At the State's request, and outside the presence of the jury during *voir dire*, Masi explained that while Taylor was in custody, he spoke to him about "STK, multiple gang stuff."[8] He testified he was wholly unaware of Taylor's reasons for being in custody, despite his testimony that while at DOC, he monitored gang communications, and remained in constant contact with law enforcement representatives, including Moran.

Masi characterized at least one interaction with Taylor as a formal face-to-face meeting that lasted "maybe" five minutes. There are no known records, notes, or reports that memorialized the interview. Masi spoke to Taylor without counsel

---

[7] Tr. at 19-22, December 5, 2023.

[8] Tr. at 29-32, December 5, 2023. The cross-examination during *voir dire* went as follows:

[DEFENSE COUNSEL]: Let's see if we limit it to your time at DOC not the DOJ, were all of those individuals incarcerated?

A. Yes, sir.

Q. And during that time you spoke to – you just listed a whole bunch of STK members, [], [], did you say?

A. Yes, sir.

Q. Diamonte Taylor?

A. Yes, sir.

****

Q. So during that time when Mr. Taylor was incarcerated pending charges is when you spoke to him?

A. I spoke to him, I believe sometime at [JTVCC]. . . I just don't recall the date.

Q. But while you were still employed with DOC?

A. Yes, sir.

Q. And you talked to him about STK?

A. Multiple things, yes.

Q. STK?

A. STK, multiple gang stuff, yes.

4

present and did not provide *Miranda* warnings. He explained that his communications with Taylor did not further inform his training and experience regarding STK.

## I. CONTENTIONS

Taylor argued that Masi's testimony presents structural errors that necessitate a mistrial. He contended any alleged statements to Masi should have been made available to him before trial. And he asserted that any potential inferences made from those statements implicated his rights against self-incrimination, to remain silent, and to counsel as guaranteed by the 5th and 6th Amendments of the U.S. Constitution.[9] Taylor maintained no curative instruction could retain the fairness of his trial.

The State conceded that Taylor's 6th Amendment right to counsel had attached when Masi spoke to Taylor but argued that communication without counsel was permissible because its purpose was related to prison safety. And because no statements were presented to the jury, it argued no harm, and thus no constitutional foul. The State suggested a curative instruction to disregard the on-stand revelation that the expert interviewed Taylor and identified him as an STK member would suffice. According to the State, Defense Counsel goaded a mistrial when he chose to ask a question to which he knew the answer,[10] and that this factor should be weighed against Taylor as another example of the "gamesmanship" demonstrated through his prior eleventh-hour filings.[11]

---

[9] This ruling is based solely on an analysis under *Pena*. On this limited record, this Court declines to entertain Taylor's arguments related to any alleged discovery or constitutional violations.

[10] This Court cannot credit the argument that Defense Counsel goaded a mistrial. The State earlier informed Defense Counsel that Masi did not even remember Taylor and, in all fairness to the prosecutors, it was only during Masi's testimony that they themselves learned he had spoken to Taylor in prison while these charges were pending.

[11] One week before trial, Taylor filed a Motion to Stay in this Court (D.I. 183) because he had filed a Petition for Writ of Mandamus with the Supreme Court of Delaware. This Court denied the stay. And the Supreme Court dismissed the Petition for Writ of Mandamus (in No. 432, 2023) on the morning of December 5, 2023, before Masi testified on cross-examination.

## II. STANDARD OF REVIEW

The "trial judge is in the best position to assess the risk of any prejudice resulting from trial events"[12] and thus, also "in the best position to determine whether a mistrial is warranted."[13] It has been long understood that "[m]istrials are required 'only where there is 'manifest necessity' or the 'ends of public justice would be otherwise defeated.'"[14] Indeed, "[t]he extreme remedy of a mistrial is required only where no 'meaningful and practical alternatives' are available to remedy an error at trial."[15] And normally, "[a] trial judge's prompt curative instructions 'are presumed to cure error and adequately direct the jury to disregard improper statements [or evidence].'"[16]

## III. DISCUSSION

This Court's consideration of whether Masi's responses on cross-examination require the declaration of a mistrial is guided by the four factors delineated in *Pena v. State*.[17] Those include: (1) the nature and frequency of the conduct or comments; (2) the likelihood of resulting prejudice; (3) the closeness of the case; and (4) the sufficiency of the trial judge's efforts to mitigate any prejudice in determining whether a witness's conduct was so prejudicial as to warrant a mistrial.[18]

At best, Masi's comments simply went awry of the prosecution's representations that his testimony would not exceed the bounds of the State's expert witness in the first trial. At worst, they constitute incurable trial error under *Pena*.

Masi is not faulted for knowing too much. But by party agreement, he was called to testify as an identical substitute and should have stuck to that role. And

---

[12] *Revel v. State*, 956 A.2d 23, 27 (Del. 2008) (citing *Brown v. State*, 897 A.2d 748, 752 (Del. 2006)) (citations omitted).

[13] *Flowers v. State*, 858 A.2d 328, 334–35 (Del. 2004) (citing *Ashley v. State*, 798 A.2d 1019, 1022 (Del. 2002)).

[14] *Pena v. State*, 856 A.2d 548, 552 (Del. 2004) (citing *Davis v. State*, 725 A.2d 441 (Del. 1999) (quoting *Steckel v. State*, 711 A.2d 5, 11 (Del. 1998)).

[15] *Flowers*, 858 A.2d at 335 (citations omitted).

[16] *Revel,* 956 A.2d at 27 (quoting *Pena*, 856 A.2d at 551) (citations omitted).

[17] 856 A.2d 548 (Del. 2004).

[18] *Pena*, 856 A.2d at 550-51 (citations omitted).

there is no doubt that the State should have disclosed Masi's prior interactions with Taylor well before Masi took the stand. But this testimony was now improperly admitted for many reasons.

## PENA'S FOUR FACTORS

Under Pena's first factor, although the frequency of the offending comments was minimal (because Defense Counsel ended the cross-examination and called for a sidebar) the nature and gravitas of this expert testimony weighs in favor of a mistrial.

In a vacuum, Masi's comment that he spoke to Taylor might have been innocuous. But on the first day of trial, Masi spent hours telling the jury that the bases of his opinions were formed by various sources, including extensive interviews he conducted with known gang members both in prison and out on the streets of Wilmington. When challenged on cross-examination about what STK member he had interviewed, Masi deliberately named Taylor as a source of this extensive knowledge, and he told the jury that Taylor was an STK member. That bell could not then be un-rung with a curative instruction.

The State's reliance on *Revel v. State*[19] is unpersuasive. *Revel* involved a police officer's isolated and accidental reference to the defendant's exercise of his constitutional right to remain silent.[20] Masi's comments were not inadvertent, they were offered to bolster his expertise. Further, unlike *Revel*, this case does not involve a comment that referenced the invocation of the right to remain silent that the Court found curable through a well-targeted instruction. Rather, Masi intentionally alerted the jury to the fact that Taylor did not remain silent. Instead, the jury learned that Taylor was interviewed and presumably made credible statements about "gang stuff" and those were part of the mix of Masi's font of knowledge about STK and Taylor's membership therein. *Revel* is inapposite.

That leads to *Pena's* second factor. Once Masi told the jury that he had interviewed Taylor, it is highly likely that prejudice resulted for several reasons. First, the jury could have inferred that what came from the interview was Taylor's tacit affirmance of the truthfulness of Masi's testimony. Second, it places Taylor in an untenable position to proceed without the ability to cross-examine on statements

---

[19] 956 A.2d 23 (Del. 2008).

[20] *Id.* at 26.

that were presumably made by him, yet never documented nor provided for inspection to the defense. Third, that an interview took place allows the jury to impermissibly infer, at best, that Masi conducted Taylor's interview in the community because Taylor was a gang member, or at worst, that Masi interviewed Taylor at DOC because Taylor was incarcerated, opening yet another Pandora's box.

Fourth, even if the jury didn't put two and two together that the interview took place while Taylor was in custody, perhaps more prejudicial was Masi's pronouncement that Taylor was interviewed because Taylor was, in fact, an STK member. The State carries the burden to prove Taylor's participation in STK gang activities. Because Taylor's STK alleged gang membership and its corresponding feud with OMB is pivotal to establish his motive to commit Wingo's murder, whether Taylor was affiliated, associated, or otherwise belonged to the group was a critical factual question for the jury. That Masi declared Taylor to be an STK member without warning was improper and obviously prejudicial. This factor weighs heavily in favor of a mistrial.

*Pena*'s third factor, the closeness of the case, is difficult to measure given the point at which this occurred in the trial proceedings, but this does not change the ruling. The State had just begun to present its case-in-chief. But upon Taylor's timely objection and mistrial request, the Court exercises its discretion in light of the record before it. This Court was compelled to err on the side of caution and ensure that Taylor's jury was not tainted by the improper comments.

Lastly, efforts to mitigate the prejudice would be futile. One alternative suggested was to strike Masi's testimony in its entirety. The suggestion that the jury could follow an instruction to disregard an entire day's worth of expert testimony is unrealistic. More problematic is the notion that the jury could be effectively instructed to disregard only the testimony that Taylor was interviewed. Given the record developed on *voir dire*, the implications of Masi's interaction with Taylor became more concerning. In these unique circumstances, a mistrial was manifestly necessary. Taylor's Motion for Mistrial is **GRANTED**.

**SO ORDERED.**

/s/ Vivian L. Medinilla
Vivian L. Medinilla
Judge

cc:   Prothonotary

8